719 P.2d 1268

STATE of New Mexico,
Plaintiff-Appellee,

v.

Anita GALLEGOS,
Defendant-Appellant.

No. 8486.

Court of Appeals of New Mexico.

Jan. 9, 1986.

Certiorari Quashed June 4, 1986.

248

Janet Clow, Chief Public Defender, Deborah A. Moll, Ass't Appellate Defender, Santa Fe, for defendant-appellant.

Paul G. Bardacke, Atty. Gen., Anthony Tupler, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

BIVINS, Judge.

Defendant appeals from her conviction in a jury trial of voluntary manslaughter. Defendant killed her ex-husband, and then-companion, George Gallegos, by shooting him at close range while he was lying in bed and then stabbing him numerous times in the neck.

Based on a long history of physical and sexual abuse, defendant raised the "battered wife syndrome" as a basis for self-defense. At the close of the evidence, the court rejected defendant's proffered self-defense instruction. Although the court had allowed the presentation of evidence of George's past brutal acts toward defendant, the court denied the instruction on the basis that, absent an obvious threat at the time of the slaying, past violent conduct could not provide the foundation for a self-defense instruction.

The trial court allowed evidence and expert testimony concerning George's past abuse of defendant and the resulting psychological effects; however, it prohibited

express use of the term "battered wife syndrome." The court also excluded the testimony of George's former wife who would have testified that she, too, had been battered by George. Finally, the trial court allowed in evidence, over defendant's objection, her statements confessing to the crime.

Defendant raises on appeal the following issues:

1. Whether the trial court erred in not submitting to the jury defendant's proposed self-defense instruction;

2. Whether the trial court erred in excluding the term "battered wife syndrome" from the testimony;

3. Whether the trial court erred in not permitting George Gallegos' former wife to testify; and

4. Whether the trial court erred in not suppressing defendant's confessions and any evidence discovered as the result of those confessions.

We reverse and remand for a new trial. We hold that the trial court erred in refusing to tender to the jury defendant's self-defense instruction. We also hold that the trial court erred in excluding the term "battered wife syndrome" from the expert's testimony and in excluding the former wife's testimony. The trial court did not err in refusing to suppress defendant's confessions.

**I. Defendant's tendered self-defense instruction.**

■ In order to assert a valid self-defense claim, a defendant must satisfy the three elements of the defense. *State v. Branchal,* 101 N.M. 498, 684 P.2d 1163 (Ct.App.), *cert. denied,* 101 N.M. 419, 683 P.2d 1341 (1984); NMSA 1978, UJI Crim. 41.41 (Cum.Supp.1985). First, there must have been the appearance to the defendant of immediate danger of death or great bodily harm. Second, the defendant, in fact, must have been put in fear by the apparent danger of death or great bodily harm, and must have killed the victim because of that fear. Finally, the defendant must have

acted as a reasonable person would have acted in the same circumstances. *Id.* A self-defense instruction must be given "whenever a defendant presents evidence sufficient to allow reasonable minds to differ as to all elements of the defense." *Id.* at 500, 684 P.2d at 1165.

With this in mind, we now analyze the evidence which defendant presented to determine whether it merited the giving of the self-defense instruction. We divide the analysis according to the elements of self-defense.

The first element requires a showing that defendant was put in fear by the appearance of an immediate threat of danger of death or great bodily injury. *State v. Branchal.* How the apparent "immediacy" of danger is determined forms the crux of the debate before us. In her proposed self-defense instruction, defendant asserted that "as a result of George Gallegos' prior violent action toward [her], and his threats to kill her," she perceived an immediate danger of death or great bodily harm. Defendant, however, introduced no evidence indicating that, at the time of the killing, George was overtly threatening her. The trial court ruled that past violent actions by George toward defendant could not, without some obvious threat, justify defendant's acts as self-defense. The court, therefore, refused to submit to the jury the tendered instruction.

We believe that under the facts presented the trial court erred in its interpretation of this element of the self-defense instruction. This element is measured by a subjective standard. *See People v. Scott,* 97 Ill.App.3d 899, 53 Ill.Dec. 657, 424 N.E.2d 70 (1981); *State v. Leidholm,* 334 N.W.2d 811 (N.D.1983). "[A]n accused's actions are to be viewed from the standpoint of a person whose mental and physical characteristics are like the accused's and who sees what the accused sees and knows what the accused knows." *Id.* at 818. In explaining the difference between a subjective and an objective test, the court in *Leidholm* said:

The significance of the difference in viewing circumstances from the standpoint of the "defendant alone" rather than from the standpoint of a "reasonably cautious person" is that the jury's consideration of the unique physical and psychological characteristics of an accused allows the jury to judge the reasonableness of the accused's actions against the accused's subjective impressions of the need to use force rather than against those impressions which a jury determines that a hypothetical reasonably cautious person would have under similar circumstances.

*Id.* at 818 (citations omitted). *See also State v. Allery*, 101 Wash.2d 591, 682 P.2d 312 (1984) (en banc).

██ The defendant must show that she was in fear of an apparent or immediate danger. The defendant, however, need not prove that she was in actual danger. *State v. Roybal*, 33 N.M. 187, 262 P. 929 (1927). Whether the defendant's fear was reasonable is measured by the third part of the self-defense instruction, that is, whether she acted as a reasonable person would have acted in the same circumstances. Thus, ours is a hybrid test, combining both, the subjective and the objective, standards: whether the defendant perceived an immediate threat and whether the reasonable person, in similar circumstances, also would have acted in self-defense.

██ The subjective perceptions of an individual, brutalized regularly by domestic violence, are especially critical to the determination of whether her actions in purported self-defense were reasonable. Victims of a battering relationship live in a hopeless vacuum of "cumulative terror." Eber, *The Battered Wife's Dilemma: To Kill or To Be Killed*, 32 Hastings L.J. 895, 928 (1981) (citation omitted). Incidents of domestic violence tend to follow predictable patterns. Recurring stimuli, such as drunkedness or jealousy, reliably incite brutal rages. Remarks or gestures which are merely offensive or perhaps even meaningless to the general public may be understood by the abused individual as an affirmation of impending physical abuse. To require the battered person to await a blatant, deadly assault before she can act in defense of herself would not only ignore unpleasant reality, but would amount to sentencing her to "murder by installment." *Id.* (citation omitted).

██ That the defendant is the victim of a violent relationship, however, is not singularly satisfactory evidence to submit to the jury the issue of self-defense. While we do not require evidence of actual physical assault, we do require some subjective showing of impending danger prior to the defendant's use of force. *State v. Branchal; Territory v. Thomason*, 4 N.M. 154, 13 P. 223 (1887). Threatening behavior or communication can satisfy the required imminence of danger. *State v. Walker*, 40 Wash.App. 658, 700 P.2d 1168 (1985). The evidence of past incidents of violence then "bears directly on the * * * apparent immediacy of danger." *State v. Branchal*, 101 N.M. at 503, 684 P.2d at 1168.

With this standard in mind, we examine the events which culminated in defendant's killing of her ex-husband. Defendant apparently has suffered a long history of physical and sexual abuse, dating back to oppressive childhood encounters with her father, her brother, and one of her mother's boyfriends. For example, according to testimony, her father beat her; her brother physically and sexually abused her; and one of her mother's lovers tied defendant to her mother's bed and fondled her while making love to her mother. Out of her turbulent relationship with the victim, George Gallegos, four children were born, but the relationship was marred with violence.

Concerning defendant's relationship with George, we first review the testimony regarding abuse, prior to the fatal night. Defendant testified that George was a heavy drinker, and she displayed to the jury scars near her eye, on her forehead, and on her nose, resulting from beatings she claimed George administered to her. George's knife was introduced into evidence. Defendant testified that George

threatened to cut off her breasts with the knife if her breasts grew any larger. When she was pregnant with their second child, defendant testified that George picked her up and threw her against a wall, causing the premature birth of the child. George's gun also was put into evidence. Defendant claimed that George would place the loaded gun at her head and threaten to shoot her if she ever left him. On numerous occasions, defendant testified, George would tie her hands behind her back and sodomize her to the point of inducing rectal bleeding. He would also force her to engage in fellatio. On one occasion, according to defendant's testimony, the Gallegos' neighbors, aware that George was abusing defendant, summoned the police. The police, however, apparently failed to take action because they had not witnessed the brutality.

On the day defendant killed George, she had taken her older children to school. She testified that when she returned home, George sodomized her against her will, making her cry and bleed. During the course of the day, George apparently drank beer. At one point in the day, defendant said that she told George that she was tired of being hurt and that she threatened to leave him. George pulled out his gun and threatened to kill her if she left. Also, on that day, George had struck one of their sons in the face with a belt buckle.

That evening, after the children went to bed, George asked the victim why she was not a virgin when they married. Defendant answered that she was not a virgin because of her brother. Defendant testified that George became angry, called her a profane name, and said "you probably liked it." At that moment, defendant testified, when she looked at George, she saw her father, her brother, and George, all coming toward her.

George then called her into the bedroom. He added something to the effect that if she did not come, he would find someone else. Defendant testified that she feared for her life. She did not know whether George intended to kill her, to rape her, or to beat her. Defendant picked up a loaded rifle which George kept in the living room. While George was lying on the bed, defendant testified that she cocked the rifle and shot him. After shooting him, defendant stabbed George numerous times.

■ We believe that defendant presented evidence sufficient to allow reasonable minds to differ as to whether defendant believed that she was in imminent danger of death or great bodily harm. Defendant was a victim of recurrent violence. On the day of George's death, he had been drinking. Already that day he had sexually abused defendant; he had struck a child in the face with a belt buckle; he had threatened to kill defendant; and, finally, he was angry and calling her into the bedroom. Based upon that evidence, reasonable minds could believe that defendant was afraid. While one inference from George's statement, that if defendant did not come into the bedroom he would find someone else, might be that George only desired sex, another equally permissible inference could be that he was using that as a ploy to catch defendant off guard so he could harm her.

She stated she was put in fear. Dr. Cave, a clinical psychologist who regularly treats battered wife cases, testified at the trial. According to Dr. Cave's opinion, the above facts, coupled with a history of prior physical, sexual and verbal abuse and her testing of defendant, the appearance of immediate danger of "great bodily harm, even death" was present. Dr. Cave testified that the history of abuse in this case, as extensive as any she had ever seen, combined with the events of the day, created "great fear" which was real to defendant.

The fear present in this case also was prompted by more than a history of abuse. Based on the brutality which defendant testified she had experienced that day, George's anger, and her knowledge of what had happened to her in similar circumstances, George's calling her into the bedroom could provide the requisite immediacy of danger.

The result we reach today finds support in a factually similar Illinois decision. *People v. Scott.* As in our case, the defendant, in *Scott,* had long suffered mental and physical abuse by a brutal companion. On the night she killed the companion, he had come home drunk and accused her of having sexual relationships with other men. While accusing her, he began beating her with a pistol and his fists. He then stopped beating her and telephoned a female friend, and told the friend that defendant would be gone in forty-five minutes. Upon overhearing that part of the conversation, defendant tried to devise a way to get herself and her youngest child out of the house. Upon realizing that an effort to depart would be in vain, she went into the bedroom and sat down on the bed. The companion, while still on the telephone, motioned, by tapping his wrist, for the defendant to bring to him handcuffs. The defendant, based on previous encounters, knew that her companion would often handcuff her before beating her. Instead of getting the handcuffs, however, she picked up a gun and shot her companion. According to the defendant, she shot him out of fear of what he might do to her. At trial, however, the court refused to instruct the jury on self-defense. The appellate court reversed the lower court, acknowledging the validity of a subjective belief of the immediacy of the threat. The court concluded that the reasonableness of the defendant's subjective belief, in light of the surrounding facts, was a question for the jury.

*Scott* closely parallels our case. Both defendants suffered long histories of abuse. Both of their companions had assaulted them on the days of the killings. Both companions had been drinking and were angry and aggressive prior to the killings. The most vital link between the two cases, however, is that prior to the killings, both companions issued a gesture or a communication from which both defendants, based upon prior abuses, could perceive impending danger. In *Scott,* the companion tapped his wrists. In our case, George called defendant into the bedroom,

the scene of violence on previous occasions. Defendant's fear could have been motivated by more than a history of abuse. Therefore, we find that reasonable minds could differ as to whether there was an immediate threat. *Compare with Jahnke v. State,* 682 P.2d 991 (Wyo.1984) (battered son guns down abusive father who at the time of the slaying presented no present danger to the son); *State v. Leaphart,* 673 S.W.2d 870 (Tenn.Cr.App.1983) (battered wife hired killers to murder husband who posed no danger to wife at the time of his death).

Having found that defendant introduced substantial evidence of imminent danger upon which reasonable minds could differ, we also conclude that defendant has satisfied the remaining two elements of the self-defense instruction. Defendant introduced sufficient evidence of George's past brutality and the ominous events of his final day upon which reasonable minds could disagree as to whether she, in fact, feared for her safety and killed George as a result of that fear. *State v. Branchal.* Finally, we rule that sufficient evidence was presented to enable reasonable minds to disagree as to whether a reasonably prudent person, in defendant's circumstances, also would have acted in self-defense. *See State v. Allery.* To deny the defense of self-defense under the facts of this case would ignore reality.

We, therefore, hold that the trial court erred in rejecting defendant's tendered self-defense instruction. (As to the adequacy of UJI 41.41, *see State v. Allery*).

## II. Exclusion of the Term "Battered Wife Syndrome."

At trial, the court allowed defendant to introduce the expert testimony of Dr. Cave on the psychological effects of being a battered woman. The court, however, ruled that the term "battered wife syndrome" could not be used. Because questions concerning the syndrome were relatively new and no New Mexico decision had yet reached the implications of recognition of

the syndrome, the court ruled that the term, "battered wife syndrome" might be prejudicial and inflammatory to the jury.

■ We disagree. Expert testimony is appropriate when the subject of the inquiry is one which jurors of normal experience could not decide without the technical assistance of an individual who possesses particular knowledge of the subject by reason of skill, experience or education. NMSA 1978, Evid.R. 702 (Repl.Pamp.1983); *State v. Smith,* 80 N.M. 126, 452 P.2d 195 (Ct.App.1969). Within that standard are two qualifications: first, the witness must be qualified as an expert; and, second, the proposed testimony must assist the trier of fact. The proposed area of expertise must have received "general acceptance in the particular field to which it belongs." *See United States v. Stifel,* 433 F.2d 431 (6th Cir.1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); *State v. Allery.* In *People v. Torres,* 128 Misc.2d 129, 488 N.Y.S.2d 358 (1985), the court said:

> The theory underlying the battered woman's syndrome has indeed passed beyond the experimental stage and gained a substantial enough scientific acceptance to warrant admissibility. [N]umerous articles and books have been published about the battered woman's syndrome; and recent findings of researchers in the field have confirmed its presence and thereby indicated that the scientific community accepts its underlying premises.

*Id.* at 134–135, 488 N.Y.S.2d at 363.

■ In our case, the trial court apparently found the psychologist qualified to testify in her area of expertise. The court evidently also determined that the "battered wife syndrome" had gained general recognition and acceptance in the field of psychology. We, therefore, see no reason for excluding use of a recognized term to describe the phenomenon. Certainly the term used to describe this condition could be no more inflammatory than its symptoms, and far less than its causes.

Accordingly, we hold that the trial court should not have excluded, during the ex-

pert's testimony, use of the term "battered wife syndrome."

## III. Excluded testimony of George's former wife.

During defendant's presentation of evidence, she made an offer of proof of the testimony of Advenita Owens. Owens was married to George during the period between his divorce from defendant and the time of his reconciliation with defendant. Owens testified, during the offer of proof, that during her marriage to George, he sexually and physically abused her. Owens' testimony paralleled defendant's testimony as to George's aggressive behavior.

Pursuant to her offer of proof, defendant argued that Owens' testimony was admissible under NMSA 1978, Evid.Rules 404, 405, 406 (Repl.Pamp.1983). Defendant also argued that the evidence was related to the "battered wife syndrome." The state argued that the testimony was inadmissible for several reasons, including that its prejudicial effect outweighed its probative value. The trial court agreed with the state that the probative value of the testimony was outweighed by its prejudicial effect, and excluded the testimony. Defendant again offered Owens' testimony as surrebuttal evidence, arguing that the state's rebuttal evidence placed the victim's character at issue. Defendant's offer of proof again was denied.

We hold that the trial court erred in excluding Owens' testimony. We realize, however, that the court's ruling was consistent with its decision to preclude defendant's self-defense claim. *State v. Bazan,* 90 N.M. 209, 561 P.2d 482 (Ct.App.), *cert. denied,* 90 N.M. 254, 561 P.2d 1347 (1977). If defendant could not claim self-defense, then defendant was barred from proving George's character by specific instances of conduct. *Id.*

■ We have held, however, that the trial court erred in refusing to instruct the jury on self-defense. In issues of self-defense, the victim's character constitutes an element of the defense which properly

can be proven by specific instances of conduct. *State v. Melendez*, 97 N.M. 740, 643 P.2d 609 (Ct.App.1981), *rev'd on other grounds*, 97 N.M. 738, 643 P.2d 607 (1982). When the trial court precludes defendant from proving an element of her defense, the court abuses its discretion. *Id.* Because Owens' testimony is highly supportive of defendant's credibility, the probative value of Owens' testimony outweighs any danger of prejudicial effect. *Id.*

### IV. Refusal to suppress defendant's confessions and resulting evidence.

Prior to trial, defendant filed a motion to suppress all statements she made to the police and to suppress all physical evidence taken from her home. The trial court denied the motion. At trial, the court instructed the jury to consider defendant's statements only if the jury determined that the statements were voluntarily given. The instruction was consistent with NMSA 1978, UJI Crim. 40.40 (Repl.Pamp.1982).

Defendant now argues that her confessions should have been suppressed because, given her physical, mental, and emotional condition, there was not substantial evidence in the record to support a finding that she knowingly, intelligently, and voluntarily waived the presence of counsel.

■ We reject defendant's argument. The trial court determines the value, weight, and inferences of the evidence. *Rodriquez v. State*, 91 N.M. 700, 580 P.2d 126 (1978). We review the evidence in a light most favorable to the trial court's ruling in order to ensure the existence of an adequate basis for the court's ruling. *State v. Lucero*, 96 N.M. 126, 628 P.2d 696 (Ct.App.1981). We review, for an abuse of discretion, the trial court's ruling. *Id.* We find no such abuse here. While there was proof to the contrary, the record provides adequate evidence that defendant voluntarily, knowingly and intelligently waived her right to the presence of counsel.

■ Finally, even if the confession were involuntary, the court's refusal to suppress admission of the confession was harmless error. *State v. Barnett*, 85 N.M. 301, 512 P.2d 61 (1973). Introduction of an unlawfully obtained confession is harmless error where other competent evidence exists to prove that the defendant committed the act in question. *Id.; See Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). In the present case, defendant substantiated in her testimony the contents of her confession. Therefore, even if the confession were involuntarily obtained, defendant's testimony renders the error harmless. *State v. Barnett.*

Accordingly, we hold that the trial court did not err in its refusal to suppress defendant's confessions and the fruits of those confessions.

We reverse and remand this case for a new trial, consistent with this opinion.

IT IS SO ORDERED.

HENDLEY and ALARID, JJ., concur.